65 A.3d 749

## THE WALLACE & GALE ASBESTOS SETTLEMENT TRUST

v.

### Sonia CARTER, et al.

No. 2018, Sept. Term, 2011.

Court of Special Appeals of Maryland.

May 2, 2013.

**490**

Mitchell Y. Mirviss, (Venable, LLP, David S. Gray, Baltimore, MD, Theodore F. Roberts, Brian A. Zemil, Towson, MD), on brief, for Appellant.

Michael T. Edmonds, (Timothy J. Hogan, Law Office of Peter T. Nicholl, on the brief), Baltimore, MD, for Appellee.

Panel: GRAEFF, KEHOE, WATTS, JJ.

WATTS, J.

Appellant, the Wallace & Gale Settlement Trust, appeals verdicts rendered against it by a jury sitting in the Circuit Court for Baltimore City, as to claims of survival and wrongful death in four cases consolidated for trial, in favor of: (1) in the

*Carter* case, plaintiffs, Sonia Carter and the Estate of Rufus Carter, and use plaintiffs, Rufus Carter, Jr., Kenneth Carter, and Natasha Sloan; (2) in the *James* case, plaintiff, the Estate of Levester James, and use plaintiffs, Katherine James, Monica James, and Kevin James; (3) in the *Lawrence* case, plaintiffs, Bernice Lawrence and the Estate of Mayso Lawrence, Sr., and use plaintiffs, Elaine McPherson, Mayso Lawrence, Jr., Phaedra Bailey, Tyrone Lawrence, Cephus Lawrence, Sean Lawrence, and Tanesha Lawrence; and (4) in the *Hewitt* case, plaintiffs, Annette Hewitt, Roger Hewitt, Jr., and the Estate of Roger Hewitt, and use plaintiffs, Idalyn Williams and Penny Hewitt.[1] Following trial, appellant moved for judgment notwithstanding the verdict or for remittitur or new trial, which the circuit court denied.

Appellant noted an appeal raising three issues, which we quote:

I. Did the circuit court err in allowing substantial damage awards to fifteen "use plaintiffs" who never joined any case prior to verdict?

II. Did the circuit court err in the *Hewitt* case by rejecting allocation of damages according to the respective harm caused by smoking and exposure to asbestos?

III. Did the circuit court err in instructing the jury that suppliers and installers have a duty to inspect, analyze, and test any product that they supply or install?

For the reasons set forth below, we answer questions I and II in the affirmative and question III in the negative. We, therefore, reverse and vacate the judgments entered against appellant in favor of the use plaintiffs, concluding that the

---

1. Appellees before this Court include the plaintiffs listed above, as well as Willean Peoples, the personal representative of Levester James's estate, and Arthur L. Drager, the personal representative of Mayso Lawrence, Sr.'s estate. Appellees do not include the use plaintiffs. For clarity, due to the common surnames among individuals, we shall refer to individuals by their first names as needed, but otherwise refer to the "plaintiffs" and the "use plaintiffs." In addition, the record contains different spellings of the first names of some of the use plaintiffs. For consistency, we shall spell the names as identified above.

statute of limitations now bars the use plaintiffs from bringing wrongful death claims. As to the *Hewitt* case, we reverse the judgments entered against appellant in favor of the plaintiffs, and remand for a new trial. We affirm the judgments entered against appellant in favor of the plaintiffs in the *Carter* case, the *James* case, and the *Lawrence* case.

## FACTUAL AND PROCEDURAL BACKGROUND

### (1) The Parties and Cases

### (a) Wallace & Gale, Incorporated ("W & G")

Established in 1881, W & G was a Baltimore-based insulation and roofing contractor that installed asbestos-containing products for various companies, including Bethlehem Steel and American Smelting & Refining Company ("ASARCO").

On November 16, 1985, W & G filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. On April 17, 2001, the United States Bankruptcy Court for the District of Maryland entered an order confirming the Fourth Amended Joint Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code, creating appellant, an entity that assumed W & G's liabilities resulting from asbestos claims.

On November 2, 2010, the United States Bankruptcy Court for the District of Maryland approved the "Second Amended and Restated Asbestos BI Claims Resolutions Procedures." Section 5.4(b) of the Procedures provided for the tolling of the statute of limitations applicable to claims against appellant. Pursuant to Section 5.4(b), claims accruing after the petition date, November 16, 1985, and prior to the implementation date, August 26, 2009, were required to be brought against appellant before: (1) the expiration of the ninety-day period immediately following the date that the Claims Materials were made publicly available to claimants, September 28, 2010, or (2) the expiration of the statute of limitations applicable to the claim, whichever was later.

### (b) The *James* Case

On January 5, 2007, Willean Peoples ("Peoples"), Levester James's ("James") stepdaughter, as personal representative of James's estate, filed a short form asbestos complaint against numerous defendants, including appellant, containing counts of negligence (survival), strict liability (survival), conspiracy, fraud, and wrongful death. Peoples alleged that James had been employed as a laborer at ASARCO from 1968 to 1972, and that, on July 4, 2004, James died from lung cancer. The case caption on the short form complaint identified the following use plaintiffs: Katherine, James's surviving spouse, Kevin, James's surviving son, and Monica, James's surviving daughter.

### (c) The *Lawrence* Case

On February 21, 2008, Arthur L. Drager ("Drager"), as personal representative of Mayso A. Lawrence, Sr.'s ("Lawrence") estate and Bernice, as Lawrence's surviving spouse, filed a short form asbestos complaint against numerous defendants, including appellant, containing counts for negligence (survival), strict liability (survival), conspiracy, fraud, and wrongful death. The complaint alleged that Lawrence worked as a laborer at ASARCO from 1968 to 1969, and as a laborer and machine operator at Bethlehem Steel from 1970 to "later into the" 1970s. On October 8, 2007, Lawrence died from lung cancer. The case caption on the short form complaint listed the following use plaintiffs: Elaine, Mayso Jr., Tyrone, Phaedra, Cephus, Sean, and Tanesha, Lawrence's four sons and three daughters.

### (d) The *Carter* Case

On February 17, 2006, Johanna Carter, as personal representative for Rufus E. Carter's ("Carter") estate, and Sonia, as Carter's surviving daughter, filed an amended short form complaint against numerous defendants including appellant, incorporating the counts set forth in the original complaint—loss of consortium, negligence (survival), strict liability (survival), conspiracy, and fraud, and adding a count alleging wrong-

ful death. Johanna alleged that Carter had been employed as a laborer and crane operator at ASARCO from 1966 to 1975. On November 6, 2003, Carter died from lung cancer. The case caption on the amended short form complaint listed the following use plaintiffs: Kenneth and Rufus Jr., Carter's sons, and Natasha, Carter's daughter.

On March 7, 2006, Sonia filed a Notice to Substitute Parties, advising that Johanna had been removed as the personal representative of Carter's estate and that Sonia had been appointed as successor personal representative of Carter's estate. Sonia notified the circuit court and the parties that she, as successor personal representative, was substituted as the party plaintiff in the survival action.

### (e) The *Hewitt* Case

On September 7, 2006, Roger C. Hewitt, Sr. ("Hewitt") and Annette Hewitt filed a short form asbestos complaint against numerous defendants alleging that Hewitt had been diagnosed with "asbestosis and asbestos-related diseases" in April 2006. Hewitt alleged that he was exposed to asbestos through his work as a laborer, mechanic steamfitter and pipe fitter at the Pennsylvania Railroad from 1943 to 1944, and as a laborer and crane operator at Bethlehem Steel from 1946 to the late 1970s. On January 5, 2007, the plaintiffs filed an Amendment by Interlineation, adding appellant as a defendant. On December 20, 2008, Hewitt died of pneumonia.

On January 23, 2009, Roger Jr. filed a Notice to Substitute Parties, notifying the circuit court and the parties that he, as personal representative of Hewitt's estate, was substituted as a party plaintiff in the survival action. On July 24, 2009, Annette, as surviving spouse of Hewitt, and Roger Jr., as personal representative of Hewitt's estate, filed an amended short form complaint, incorporating the counts set forth in the original complaint-loss of consortium, negligence (survival), strict liability (survival), conspiracy, and fraud, and adding a count alleging wrongful death. The case caption on the amended short form complaint identified the following use plaintiffs: Penny and Idalyn, surviving daughters.

On the same day, July 24, 2009, Roger Jr. filed an Amendment by Interlineation to Add Disease Process, alleging that recent medical records indicated that, in addition to asbestosis, Hewitt had also suffered from lung cancer causally connected to his exposure to asbestos and asbestos products.

### (2) Pre–Trial Proceedings

On November 10, 2009, the circuit court consolidated the four cases for trial, scheduled to begin on January 18, 2011.

### (a) Answers to Interrogatories

In three of the cases—the *James*, *Lawrence*, and *Carter* cases—personal representatives filed answers to interrogatories, referring to themselves as the singular "Plaintiff."

In the *Hewitt* case, plaintiff Roger Jr. filed answers to interrogatories. Throughout the answers to interrogatories, Roger Jr. is referred to as the singular "Plaintiff." In one answer, Roger Jr. stated that Hewitt smoked approximately one-half to one pack of cigarettes per day from approximately 1943 to approximately 2008.

### (b) Proposed *Voir Dire*

On December 20, 2010, approximately one month before the start of trial, the plaintiffs filed proposed *voir dire*. As to plaintiffs, question 2 of the proposed *voir dire* asked the following:

Is any member of the panel or any member of your immediate family, or close circle of friends related to or otherwise acquainted with the plaintiffs:

| Rufus E. Carter | Sonia Carter (PR & Child) |
| | Johanna Carter (Spouse) |
| | Kenneth Carter (Child) |
| | Rufus Carter, Jr. (Child) |
| | Natasha Sloan (Child) |

***

| Roger C. Hewitt, Sr. | Roger C. Hewitt, Jr. (PR & Child) |
| | Annette Hewitt (Spouse) |

| | |
|---|---|
| Levester James | Willean Peoples (PR & Child) |
| | Katherine James (Spouse) |
| | Monica James (Child) |
| | Tony James (Child) |
| | |
| Mayso A. Lawrence, Sr. | Arthur L. Drager, Esq. (PR) |
| | Bernice Lawrence (Spouse) |
| | Elaine L. McPherson (Child) |
| | Mayso Lawrence, Jr. (Child) |
| | Tyrone Lawrence (Child) |
| | Tanesha Lawrence (Child) |
| | Pha[e]dr[]a Bailey (Child) |
| | Ceph[u]s Lawrence (Child) |
| | Sean Lawrence (Child) |

## (c) Pre–Trial Motions

On January 3, 2011, appellant filed a motion to exclude fact witnesses not produced for discovery deposition. Asserting that trial was scheduled to begin in two weeks and that its ability to prepare a defense had been "significantly and unfairly prejudiced[,]" appellant requested that the circuit court exclude all fact witnesses not offered for deposition by October 18, 2010, from testifying at trial. The circuit court denied the motion to exclude and continued the trial for three weeks. During the three week continuance, appellant's counsel conducted approximately thirty depositions of family members, including some of the individuals identified as use plaintiffs.

## (3) Trial Generally

A jury trial was held from February 9, 2011, to February 11, 2011, February 14, 2011, to February 18, 2011, February 22, 2011, to February 25, 2011, and February 28, 2011, to March 2, 2011.

### (a) *Voir Dire*

On February 9, 2011, during the morning session of *voir dire,* the circuit court asked the following questions as to the plaintiffs in the case:

The plaintiffs in the case are Rufus Carter, Roger Hewitt, Levester James, Mayso Lawrence.

Do any of you know any of these folks? Any of you know them?

During the afternoon session of *voir dire*, the circuit court again identified the plaintiffs in the case as Rufus Carter, Roger Hewitt, Levester James, and Mayso Lawrence.

### (b) Opening Statements

In opening statement, plaintiffs' counsel identified the plaintiffs in the case as follows:

Good morning, Ladies and Gentlemen of the Jury.... I, along with my co-counsel, represent the four plaintiffs and families in this matter.

The plaintiffs are Levester James, Rufus Carter, Roger Hewitt and Mayso Lawrence.

### (c) Apportionment in the *Hewitt* Case

Hewitt was a crane operator who worked at Bethlehem Steel from 1946 to the late 1970s. Hewitt was a cigarette smoker who smoked a half a pack to a pack per day. Hewitt was diagnosed with lung cancer in October 2008, and died on December 20, 2008, at eighty-one years old.

At trial, Dr. Steven Zimmet testified that asbestos exposure was a substantial contributing cause to Hewitt's lung cancer, and that smoking was also a cause of Hewitt's lung cancer. According to Dr. Zimmet, he could not differentiate "which caused what" because the two exposures are "not just additive, they are synergistic which means they multiply exposures." At trial, appellant conceded that Hewitt had asbestosis and that asbestos had contributed to his lung cancer. Appellant's counsel requested that the circuit court permit apportionment of damages, and appellees' counsel objected, arguing that trial courts have never addressed the apportionment of damages for smoking, and that it would not be possible to apportion anyway. Appellant's counsel responded that there was a "strong foundation" for apportionment and that its expert, Dr. Gerald R. Kerby, would render an opinion that apportionment of damages is possible based on epidemiology studies and other scientific studies. The circuit court expressed doubt that the damages could be apportioned, commenting:

No, I understand there is statistical basis for likelihood of risk. But in a given—with a given plaintiff, I don't know how you can apportion it. But, you know, I guess, the witness can say what he says if he is qualified to say it.

But I'm not going to give an instruction on this because it is not—I don't perceive it at this point to be the law in these type of cases.

\* \* \*

You can apportion risk. I don't know how, in an individual plaintiff['s] case, you can apportion damages. I don't know. It is a mystery to me.

We'll find out. This doctor will show up, and we'll hear about it.

Subsequently, appellant's counsel filed an offer of proof regarding Dr. Kerby's testimony, which provided, in pertinent part, as follows:

1. Dr. Kerby has reviewed the [Hewitt] case including Mr. Hewitt's medical records, currently in evidence as Defendant's Exhibit no. 6, x-rays and Plaintiff's Answers to Defendants' Master Interrogatories, attached hereto as Defendant's Exhibit No. 1 for identification.

2. Based on a review of the information contained in Paragraph No. 1, Dr. Kerby understands that Mr. Hewitt was occupationally exposed to asbestos from 1943 to 1978 while working for the Pennsylvania Railroad and Bethlehem Steel Sparrows Point Steel Mill. Further, Dr. Kerby understands, based on the information contained in Paragraph No. 1 herein, that Mr. Hewitt smoked cigarettes from 1943 to 2008 at a rate of ½ pack to 1 pack per day.

3. Based on a review of the information contained in Paragraph No. 1 herein, Dr. Kerby is aware that Mr. Hewitt developed lung cancer in October 2008 and died on December 20, 2008 as a consequence of the lung cancer.

4. Based on his review of Mr. Hewitt's medical records and x-rays identified in Paragraph No. 1, Dr. Kerby is of the opinion that Mr. Hewitt had pulmonary asbestosis and as a result, Mr. Hewitt's history of occupational exposure to

asbestos was a substantial contributing factor to the development of Mr. Hewitt's lung cancer and death therefrom.

5. Further, based on his review of the information contained in Paragraph No. 1, Dr. Kerby is also of the opinion that Mr. Hewitt's cigarette smoking history was also a substantial contributing factor to the development of Mr. Hewitt's lung cancer and death therefrom.

6. Dr. Kerby is of the opinion that there is a reasonable medical and scientific basis for determining the relative contributions of Mr. Hewitt's cigarette smoking history and Mr. Hewitt's occupational history of asbestos exposure to the development of Mr. Hewitt's lung cancer and death therefrom.

7. The reasonable medical and scientific basis for determining the relative contributions of Mr. Hewitt's cigarette smoking history and occupational history of asbestos exposure to the development of his lung cancer and death therefrom is derived from epidemiologic studies concerning asbestos, cigarette smoking and the risk of lung cancer.

\* \* \*

11. Based on the foregoing, Dr. Kerby, if permitted, would opine that the relative contribution of Mr. Hewitt's cigarette smoking history to the development of his lung cancer and resultant death was 75%.

12. Based on the foregoing, Dr. Kerby, if permitted, would opine that the relative contribution of Mr. Hewitt's history of occupational exposure to asbestos (in the setting of asbestosis) to the development of his lung cancer and resultant death was 25%.

The circuit court accepted the offer of proof, but excluded Dr. Kerby's testimony concerning apportionment of damages, stating: "It is just this effort to apportion doesn't really work for me. It doesn't make any sense[.]"

Appellant's counsel offered Dr. Kerby as an expert in pulmonary medicine and the historical development of knowledge in the medical and scientific community regarding asbes-

tos and disease. The circuit court accepted Dr. Kerby as an expert in those areas with no objection from the plaintiffs.

### (d) Use Plaintiffs

At the conclusion of the plaintiffs' case, appellant filed a Motion for Directed Verdict Based on the Statute of Limitations, arguing, in pertinent part, as follows:

> Plaintiffs in the [*James*] and [*Carter*] cases failed to join all necessary parties to the action as required under Maryland Rule 15–1001. Certain "use" plaintiffs—*e.g.*, those not joined in the action-were never properly added to these cases. In both cases, plaintiffs listed "use" plaintiffs for the decedent's family members when filing their wrongful death actions. At trial, plaintiffs have called the "use" plaintiffs to present evidence as to their wrongful death claims against [appellant]. The "use" plaintiffs were never amended into the Plaintiffs' complaints and limitations has run. Plaintiffs are now precluded from amending their complaints to add necessary parties. [Appellant] is therefore entitled to directed verdict as to the claims of the "use" plaintiffs.

(Citation omitted). Appellant requested that the circuit court "find that the current wrongful death claims for 'use' plaintiffs Katherine James, [Kevin] James, Monica James, Kenneth Carter, Rufus Carter, Jr., and Natasha Sloan [were] improper" and time barred.

At the conclusion of the plaintiffs' case, appellant's counsel orally moved for judgment "against all the plaintiff's cases on all the respective counts." Appellant's counsel argued, in pertinent part, that the use plaintiffs failed to join the action as "necessary parties," and that the use plaintiffs were identified only to give them notice of the action. The circuit court denied the motion for judgment with leave for appellant's counsel to renew the motion at the close of all the evidence.

After the close of all of the evidence, appellant's counsel renewed the motion for judgment. As to the issue of the use plaintiffs, the circuit court observed the following:

To my mind, usually a use plaintiff sues filing in one person's name for use of another person. And that's usually been where I bump into it. So that implies that someone has a fiduciary relationship and someone else is supposed to be serving their interest. But that's not what goes on here.

The circuit court commented: "What is the harm of leaving them in, let them render a judgment, that way if it goes up on appeal and they happen to be right—it doesn't matter whether they are right, if they happen to convince several people that they are right, then there is no—they have to go back and retry the use plaintiffs." The circuit court reasoned that it was best to include the use plaintiffs on the verdict sheets because if it decided appellant's counsel was correct, then it could "just strike all the verdicts against the use plaintiffs and it goes up on appeal and they can deal with it however they choose to deal with it."

### (e) Verdict Sheets

On February 23, 2011, appellant filed proposed revised verdict forms for the four cases. In the *Hewitt* case, the proposed verdict form contained questions concerning apportionment, including the following:

6. Do you find by a preponderance of the evidence that the compensatory damages of the Estate of Roger Hewitt can be apportioned between cigarette smoking and asbestos exposure?

YES _____ NO _____

**[If YES, answer 6a and 6b below. If NO, go to question 7]**

6a. What percent of the Estate of Roger Hewitt's compensatory damages are related to Mr. Hewitt's cigarette smoking?

_____%

6a. What percent of the Estate of Roger Hewitt's compensatory damages are related to Mr. Hewitt's asbestos exposure[?]

_____%

7. What amount of compensatory damages, if any, do you award Annette Hewitt, widow of Roger Hewitt, as a result of the death of Mr. Hewitt?

$_____

8. Do you find by a preponderance of the evidence that the compensatory damages of Annette Hewitt can be apportioned between cigarette smoking and asbestos exposure?

YES _____ NO _____

**[If YES, answer 8a and 8b below. If NO, go to question 9]**

8a. What percent of [ ] Annette Hewitt's compensatory damages are related to Mr. Hewitt's cigarette smoking?

_____%

8b. What percent of Annette Hewitt's compensatory damages are related to Mr. Hewitt's asbestos exposure[?]

_____%

After the close of all of the evidence, plaintiffs' counsel addressed the verdict sheets and apportionment, stating: "I am concerned about the verdict sheets. If Your Honor ruled, I would ask if [appellant's counsel] is going to do the verdict sheets that the apportionment part come out and that each of the wrongful death claimants be listed." The circuit court agreed. As a result, in the *Hewitt* case, no question concerning apportionment was included on the verdict form.

### (f) Jury Instructions

Prior to the court instructing the jury, the parties discussed jury instructions. Appellant's counsel objected to instruction number 28, titled "state of the art," arguing:

I think the objection we have is the last language here at the end, manufacturer, supplier-installer, particularly we're talking about supplier-installers have a duty to test, analyze, inspect.

And for the reasons we already discussed, that wouldn't be appropriate.

The circuit court overruled the objection.

Appellant requested a jury instruction concerning apportionment of damages in the *Hewitt* case, which read as follows:

If you decide that plaintiff suffered from an asbestos-related lung disease for which the defendant is responsible, and that plaintiff had a history of smoking and/or tobacco exposure, and that plaintiff's asbestos exposure and plaintiff's smoking history and/or tobacco exposure were both substantial contributing factors in the development of plaintiff's lung disease, then you shall apportion the damages between plaintiff's asbestos exposure and plaintiff's smoking history/tobacco exposure. This apportionment of damages should be based on the percentage you believe each factor contributed to plaintiff's lung disease.

The circuit court declined to give the requested instruction on apportionment, ruling:

It is just not the law in these cases. But I understand the theory. Although it does strike me, with all due respect. It is kind of a very unscientific wild guess you're asking the jury to make. I mean, there is no real basis in the record, nor could there ever be.

After the close of all the evidence, the circuit court instructed the jury, in pertinent part, as follows:

The duty of the non manufacturer supplier to warn plaintiffs is different under some circumstances than the duty of a manufacturer. In general, the supplier-installer is not held to a standard as strict as imposed on the manufacturer.

If, however, that you find—if, however, you find that the plaintiffs' claim against the supplier-installer is based upon claimed exposure to the installation or application of asbestos-containing products by the defendant, then the installer-supplier has the duty to warn the plaintiff of the dangers of which the installer-supplier was actually then aware or which it should have discovered in light of its particular

skill, knowledge, or expertise gained in the course of handling or installing such products.

When a seller or other manufacturer is nothing more than a conduit between manufacturer and customer, the retailer or supplier ordinarily has no duty to discover the defects or dangers of a particular product.

However—pardon me.

However, if the installer-supplier does something more than merely act as a conduit of goods, then those additional acts may impose a higher standard of care.

If you find the installer-supplier not only supplied asbestos products to various job sites, but also that its employees installed these products, and if you further find the installer created a danger to other workers, that may impose upon the installer-supplier a duty to discover the products were dangerous by reading the literature that was available at the time.

You may consider what reasonably should have been discovered in light of the supplier and installer's particular oppor—peculiar opportunity and competence as a dealer in a particular product.

As to strict liability only, strict liability does not apply where the predominant purpose of the defendant's conduct was provision of a service rather than sale of the good.

If you find the predominant purpose of the defendant's product at work in which it used any asbestos-containing building materials was the provision of a service only rather than a sale of goods, then you must find in favor of the defendant as to the plaintiffs' claim of strict liability.

**State of the art. You heard a lot of discussion about state of the art. Under both negligence and strict liability theories, the manufacturer is held to the knowledge of and skill of an expert.**

**The manufacturer's status as an expert means that, at a minimum, the manufacturer must keep abreast of**

scientific knowledge, discoveries, and advances, and is presumed to know what is imparted thereby.

Industry standards and the state of the art are not synonymous.

State of the art includes all available knowledge on a subject at a given time. This includes scientific, medical, engineering, and other knowledge that may be available. State of the art includes the amount of time, what was known, when was this knowledge available.

The manufacturer supplier or installer is under a duty to use ordinary care to test, analyze, and inspect the products it sells, installs, or uses—sells, supplies, or installs. I'm sorry.

Efficacy of warning. If a warning would not have prevented the harm from occurring, then a defendant who failed to warn is not responsible because the absence of a warning could not have been or would not have been the cause of the injury.

Considering this issue may—you may presume that people ordinarily exercise—pardon me—that people exercise ordinary care for their own safety.

Presumption of due care arises from the natural instinct of human beings to guard against danger, namely the known and ordinary disposition of people to guard themselves from danger or risk. It is therefore presumed that if a warning is given, it will be read and heeded.

(Emphasis added).

At the end of jury instructions, appellant's counsel excepted to several instructions, arguing:

I would like to make an objection on the record now about the particular item, No. 24, Your Honor, the duty to inspect. It wasn't plead by the plaintiff. There's no duty from the supplier-installer regarding design, manufacture, testing or inspection.

Furthermore, you read it in regard to manufacturer. I think it is confusing to the jury.

\* \* \*

Next, 28 state of the art, they did not plead failure to analyze test or inspect. There is no duty to analyze, test, or inspect, and it did not include the nonobscure literature reference this time.

\* \* \*

And lastly, just to reserve under the apportionment of damages you had a prior ruling so obviously it wasn't read but.

\* \* \*

One additional one, Your Honor. To the extent that the instructions as a whole are referring to plaintiffs as plaintiffs, wherein we contest that use plaintiffs had not been joined to this action and had claims said in this action, I want to register an objection now because it just conferred plaintiffs status to the jury for use plaintiffs.

The circuit court noted the exceptions, but took no further action.

### (g) Verdicts and Judgments

The jury returned verdicts in favor of the plaintiffs and use plaintiffs, in the following amounts: (1) *James* case—$2,035,684.71; (2) *Lawrence* case—$2,930,532.09; (3) *Carter* case—$2,017,302.50; and (4) *Hewitt* case—$2,686,686.07.

On May 12, 2011, the circuit court entered orders in the four cases reducing the jury verdicts after application of the cap on non-economic damages, bankruptcy settlement payments, and joint tortfeasor credit for appellant's cross-claims against another defendant (*i.e.* pro rata share allocation). The jury verdicts were reduced to the following judgments:

(1) *James* case

| | |
|---|---|
| Survival | $503,959.39 (total) |
| | |
| Wrongful death | $476,250.50 (total) |
| Use Plaintiff Katherine James | $238,125.50 |
| Use Plaintiff Monica James | $119,062.50 |
| Use Plaintiff Kevin James | $119,062.50 |
| | |
| **Total Judgment:** | **$980,209.89** |

(2) *Lawrence* case

| | |
|---|---|
| Survival | $261,371.24 (total) |
| | |
| Wrongful death | $521,250 (total) |
| Plaintiff Bernice Lawrence | $108,593.74 |
| Use Plaintiff Elaine McPherson | $ 32,578.13 |
| Use Plaintiff Mayso Lawrence, Jr. | $ 32,578.13 |
| Use Plaintiff Phaedra Bailey | $ 32,578.13 |
| Use Plaintiff Tyrone Lawrence | $ 32,578.13 |
| Use Plaintiff Cephus Lawrence | $ 32,578.13 |
| Use Plaintiff Sean Lawrence | $ 32,578.13 |
| Use Plaintiff Tanesha Lawrence | $217,187.48 |
| | |
| **Total Judgment:** | **$782,621.24** |

(3) *Carter* case

| | |
|---|---|
| Survival | $499,953.41 (total) |
| | |
| Wrongful death | $476,250 (total) |
| Plaintiff Sonia Carter | $119,062.50 |
| Use Plaintiff Rufus Carter, Jr. | $119,062.50 |
| Use Plaintiff Kenneth Carter | $119,062.50 |
| Use Plaintiff Natasha Sloan | $119,062.50 |
| | |
| **Total Judgment:** | **$976,203.41** |

(4) *Hewitt* case

| | |
|---|---|
| Survival | $ 687,394 (total) |
| | |
| Loss of consortium | $ 169,050.97 (total) |
| | |
| Wrongful death | $ 469,050.98 (total) |
| Plaintiff Annette Hewitt | $ 172,808.26 |
| Plaintiff Roger C. Hewitt, Jr. | $ 98,747.58 |
| Use Plaintiff Idalyn Williams | $ 98,747.57 |
| Use Plaintiff Penny Hewitt | $ 98,747.57 |
| | |
| **Total Judgment:** | **$1,325,495.95** |

On November 30, 2011, and December 1, 2011, the circuit court issued notices of recorded judgments.

### (4) Post–Trial Motion and Rulings

Appellant filed a Motion for Judgment Notwithstanding the Verdict, Motion for New Trial, and Motion for A Remittitur (the "post-trial motion"), again raising the issue of the use plaintiffs, apportionment in the *Hewitt* case, and issues as to the jury instructions.

As to the issue of apportionment in the *Hewitt* case, appellant argued that the circuit court erroneously refused to instruct the jury as to apportionment and excluded the expert testimony of Dr. Kerby. Appellant asserted that Maryland law generally recognizes apportionment of damages in tort cases where the criteria set forth in the Restatement are satisfied. According to appellant, "Dr. Kerby's proffered testimony satisfied the Restatement's requirements for allowing the jury to apportion damages between the two causes."

In a response to the post-trial motion, as to the apportionment of damages in the *Hewitt* case, appellees contended that Hewitt's lung cancer was an indivisible injury, and that appellant's request was actually a request to apply comparative fault, which has "been refused both in [Maryland] courts and by legislature." Appellees argued that because Maryland is not a comparative fault state, the circuit court did not need to address the exclusion of Dr. Kerby's testimony.

Appellant filed a reply memorandum in support of its post-trial motion.

On July 21, 2011, the circuit court held a hearing on the post-trial motion. The circuit court denied the post-trial motion as to the apportionment issue, ruling from the bench:

All right. I'm going to deny. I find it a fascinating argument. I'm going to deny it. It will be preserved for appeal, if you can convince the Court of Special Appeals/Court of Appeals with this. It's a fascinating argument.

I just have no idea how—we're already putting on the jury's shoulders and into their heads material that, sitting here listening to these cases, I have listened to how many, eight or ten or how many I've heard is really—approaches the unknowable to start with. And then you start having them divide up and apportion different levels of the unknowable among different parties. It's just too much.

It's a fascinating issue. I think that if the legislature wanted to pass a bill saying in all cases where there's smoking and there's asbestos inhalation, we'll divide the liability in the following fashion based upon epidemiological studies, I guess they could do that.

If the Court of Appeals wants to send us down that path to another swamp, I suppose we could do that. It's an interesting issue. Technologically, it's interesting. But we don't have any basis for drawing an intelligent conclusion regarding what we're going to plug into the matrix. So no, we're not doing that.

Interesting argument. Like it, but never happen in here.

As to the giving of the jury instruction on the duty to inspect, test, or analyze, the circuit court denied the post-trial motion, ruling: "I'm not going to grant the motion, because I think even if I were wrong, I think it was harmless."

At the end of the post-trial motion hearing, the circuit court held the issue of the use plaintiffs *sub curia,* stating:

Now, this—so we're on the record and clear about this. I'm going to hold off on this mess with the use plaintiffs, but not too long, because I'll forget everything we argued about if I go too long, and we're going to try to have a time ... when ... we can have an intelligent discussion.

On October 13, 2011, the circuit court held a brief hearing on the outstanding issue of the use plaintiffs, and ruled as follows:

Right. Right. And there is no question that use plaintiffs have to be included. They're supposed to be included. They're necessary parties.

Honestly, I don't know what the right answer is. But I'm going to rule in favor of the plaintiffs on this and get this on to appeal by allowing the verdicts, although I have serious qualms, quite frankly, in my own mind as to how you can throw someone in.

I did it, admittedly. I did it, so I might as well deal with the consequences of it. I did it sort of as a safety device, and I don't think the law is particularly clear.

The issue clearly is defined in my mind as does a use plaintiff who otherwise didn't appear until the trial and never got moved into the case until it was ready for verdict, are they entitled to have a verdict entered in their name? Or are they simply entitled to share in whatever verdict is taken in the name of the plaintiffs in the case.

Common sense tells me that if you're a use plaintiff, you shouldn't—I shouldn't have put them on the verdict sheet. But the court of appeals decision—I don't think it really clears the issue up.

But since I put them on the verdict sheet, I'll stick with that. And we'll allow the verdict to stand with respect to that and over[ ]rule motions, although I think honestly it is very dubious. I'm doing the best I can with what I have because I did it. Whatever mess we have, I created by not dealing with that up front.

So, I'll allow it to stand. And it will go on appeal. And it will work out itself.

I don't think there is any definitive law in Maryland on exactly how to deal with exactly this factual situation.

On October 18, 2011, the circuit court entered an order denying appellant's post-trial motions. On November 15, 2011, appellant filed a notice of appeal.

## DISCUSSION

### I.

#### (1) Contentions

■ Relying on *Univ. of Md. Med. Sys. Corp. v. Muti,* 426 Md. 358, 44 A.3d 380 (2012), appellant contends that the

"failure of the 'use plaintiffs' to join the actions precludes them from recovering damages." Appellant argues that, by the plain language of Maryland Rule 15–1001, use plaintiffs are statutory beneficiaries who have not joined the action as party plaintiffs. Appellant argues that the circuit court lacked jurisdiction over the use plaintiffs as they were not served with process, and that the use plaintiffs were "not required to participate in pretrial proceedings, submit to written discovery, or accept other obligations imposed on a party." Appellant asserts that the plaintiffs in the instant case "acted as if the use plaintiffs were not parties and owed no obligations to the defense[,]" and "ignored discovery requests and refused to present the use plaintiffs for deposition until compelled by the [circuit] court[.]" Appellant maintains that the use plaintiffs inexplicably failed to join the action throughout the case, waiting until the end of the trial, after the close of evidence, to move to join as plaintiffs.

Appellant contends that the failure of the use plaintiffs to timely join the action is "fatal" as the statute of limitations has expired as to their claims. Appellant argues that under the Wrongful Death Act, an action must be brought within three years after discovery of an occupational cause of death, and, under the Claims Resolution Procedures for its bankruptcy discharge, claims must be brought against appellant before the expiration of limitations as set forth in the Wrongful Death Act or December 28, 2010, whichever is later. Appellant asserts that, as to the *Carter* and *James* cases, the use plaintiffs were required to join the action, *i.e.* bring a claim for wrongful death, by December 28, 2010, as to the *Lawrence* case, February 21, 2011, and, as to the *Hewitt* case, December 20, 2011, or, at the latest, July 24, 2012. Appellant maintains that, as the claims of the use plaintiffs would supplement the claims of the named plaintiffs and possibly increase appellant's liability, the claims of the use plaintiffs do not "relate back" and are time-barred.

Appellees respond that "designating individuals as use plaintiffs accomplishes joinder of those use plaintiffs in the action so that they are proper parties in interest in the case."

Appellees contend that the use plaintiffs were parties to the action and were properly awarded damages by the jury. Appellees argue that appellant and the circuit court had "clear notice" that all of the plaintiffs—including the use plaintiffs—were "claiming their share." In support of this argument, appellees point out the following as to the use plaintiffs: "They were listed in plaintiffs' Answer to Interrogatories; they were deposed pre-trial; they were introduced to the jury at voir dire; they were called as witnesses at trial and they were on the verdict sheets." Appellees contend that appellant's reliance on *dicta* from *Muti* is misplaced, and that *Muti* is not dispositive as it addressed a different factual scenario. Appellees argue that, unlike in *Muti*—where a potential beneficiary was not named as a use plaintiff—in this case, all plaintiffs and use plaintiffs participated in the action.

As to the statute of limitations, appellees contend the use plaintiffs are not time barred because they are not new parties, and do not bring new causes of action. Appellees argue that the filings of the use plaintiffs would relate back to the original filing when the wrongful death claimants were named.[2]

In a reply brief, reiterating that *Muti* is dispositive and that the use plaintiffs are not parties, appellant asks: "How could [the use plaintiffs] be bound by a judgment of the court absent service of process or voluntary invocation of the court's jurisdiction?" Appellant contends that, contrary to appellees' arguments, counsel for the plaintiffs never entered an appearance on behalf of any of the use plaintiffs, and conceded before the circuit court that the use plaintiffs had not affirmatively joined the case.

---

**2.** The doctrine of relation back provides that, if an amended complaint does not state a new cause of action, then the statute of limitations is determined with reference to the date of the original filing, *i.e.* the amended pleading will "relate back" to the original filing date. *See Grand–Pierre v. Montgomery Cnty.*, 97 Md.App. 170, 175–76, 627 A.2d 550 (1993) (citations omitted).

## (2) Law

The Maryland Wrongful Death Act, contained at Md.Code Ann., Cts. & Jud. Proc. Art. ("C.J.P.") § 3–901 *et seq.*, sets forth provisions governing actions for wrongful death. C.J.P. § 3–904, entitled "Action for wrongful death," provides, in pertinent part:

(a) Primary beneficiaries.—

(1) Except as provided in paragraphs (2) and (3) of this subsection, an action under this subtitle shall be for the benefit of the wife, husband, parent, and child of the deceased person.

. . .

(c) Damages to be divided among beneficiaries.—

(1) In an action under this subtitle, damages may be awarded to the beneficiaries proportioned to the injury resulting from the wrongful death.

. . .

(f) Restriction to one action under this subtitle.—Only one action under this subtitle lies in respect to the death of a person.

(g) Action to commence within three years; deaths caused by occupational disease or criminal homicide.—

(1) Except as provided in paragraph (2) or (3) of this subsection, an action under this subtitle shall be filed within three years after the death of the injured person.

(2)(i) In this paragraph, "occupational disease" means a disease caused by exposure to any toxic substance in the person's workplace and contracted by a person in the course of the person's employment.

(ii) If an occupational disease was a cause of a person's death, an action shall be filed:

1. Within 10 years of the time of death; or

2. Within 3 years of the date when the cause of death was discovered, whichever is the shorter.

At the time of the actions underlying this appeal, Maryland Rule 15–1001, governing wrongful death actions, provided, in pertinent part:

(a) Applicability. This Rule applies to an action involving a claim for damages for wrongful death.

(b) Plaintiff. If the wrongful act occurred in this State, all persons who are or may be entitled by law to damages by reason of the wrongful death shall be named as plaintiffs whether or not they join in the action. The words "to the use of" shall precede the name of any person named as a plaintiff who does not join in the action.

(c) Notice to use plaintiff. The party bringing the action shall mail a copy of the complaint by certified mail to any use plaintiff at the use plaintiff's last known address. Proof of mailing shall be filed as provided in Rule 2–126.

In *Walker v. Essex*, 318 Md. 516, 524, 569 A.2d 645 (1990), a wrongful death case, the Court of Appeals vacated a judgment entered on behalf of only one of two potential beneficiaries, holding that the "judgment should not have been entered in the [trial] court unless it included the interests of all of the known beneficiaries." In *Walker, id.* at 523, 569 A.2d 645, the Court of Appeals discussed the unique nature and purpose of the Maryland Wrongful Death Act, explaining:

[U]nder our statute the suit is brought in the name of a person entitled to recover, and to the use of all such parties who may have an interest. Many states require a cause of action to be brought in the name of the personal representative, executor or administrator of the estate. When a wrongful death action is settled by the personal representative, the proceeds are distributed according to statute. An issue is unlikely to arise as to settlements by only one of several beneficiaries who are part of the suit where all are represented by one responsible plaintiff. Unlike most other states, Maryland has two independent causes of action; one claim is in the name of the personal representative for any claim the deceased could have maintained; the other claim is brought on behalf of the surviving heirs or beneficiaries

for their loss resulting from the death of the spouse, parent or child.

(Footnote omitted).

The Court of Appeals held that, based on the language of the Wrongful Death Act and accompanying rule, settlement by one wrongful death beneficiary requires mutual consent of the other joined beneficiaries or court approval. *Id.* at 518, 569 A.2d 645. The Court of Appeals concluded as follows:

When looking to the direction of [C.J.P.] § 3–904[ ], we are told that "only one action under this subtitle lies in respect to the death of a person." We are also instructed that, if a recovery or verdict is obtained in this one action, the amount recovered shall be "divided among the beneficiaries in shares directed by the verdict." The statutory language does not allow a judgment for one of the beneficiaries to be made a matter of record, as by its very nature, other claims are forever foreclosed or barred. The trial [court] in this case considered the claims of the beneficiaries to be severable. The statute does not. A judgment should not have been entered in the [trial] court unless it included the interests of all of the known beneficiaries.

*Id.* at 523–24, 569 A.2d 645.

In *Williams v. Work,* 192 Md.App. 438, 463, 995 A.2d 744 (2010), *aff'd sub nom. Ace Am. Ins. Co. v. Williams,* 418 Md. 400, 15 A.3d 761 (2011), this Court vacated the trial court's judgment and settlement, holding that "all statutory beneficiaries are to be either plaintiffs or use plaintiffs[.]" In the case, the decedent died as a result of an accident, survived by his wife, Lori, and his children. *Id.* at 443–44, 15 A.3d 761. The wife brought suit against the defendants, *Williams I,* as the decedent's personal representative but two of the decedent's sons were not named as plaintiffs or use plaintiffs. *Id.* at 444, 15 A.3d 761.

Later, the wife's counsel, now representing the two sons, filed a second lawsuit against the defendants, *Williams II,* seeking damages for the wrongful death of the decedent. *Id.* at 448, 995 A.2d 744. A year later, the two sons moved to

reopen *Williams I* and to consolidate it with *Williams II,* asserting that, "as primary wrongful death beneficiaries, who did not receive any compensation and who had not consented to the settlement in *Williams I,* they [were] entitled to recover for the wrongful death of their father." *Id.* The defendants filed motions for summary judgment in *Williams II,* which were granted. *Id.* at 449–50, 995 A.2d 744.

We observed that nothing in the record demonstrated that the sons were named as plaintiffs as required by Maryland Rule 15–1001. *Id.* at 452, 995 A.2d 744. In discussing the concept of use plaintiffs, we stated that Maryland Rule 15–1001 "is in the nature of a joinder rule or a condition precedent that requires all known statutory beneficiaries, *i.e.,* the real parties in interest, be identified as parties to the litigation." *Id.* We discussed Maryland Rule 15–1001 as follows:

Although Rule 15–1001(b) does not require the statutory beneficiaries to formally join the litigation, "all persons who are or may be entitled by law to damages by reason of the wrongful death shall be named as plaintiffs." The words "to the use of" simply identify plaintiffs who have not formally joined the action, but, as real parties in interest, they are plaintiffs whose interests must be acknowledged and protected throughout the litigation.

Although Rule 15–1001(b) does not require formal joinder, the failure to include a known statutory beneficiary as a plaintiff or a "use plaintiff" in a wrongful death action and to settle without providing for that beneficiary can be analogized to the failure to join a necessary party in an action where joinder is required. In our view, because of the one action rule, the failure to do so is a "defect" or "mistake" of jurisdictional proportions in the proceeding, which may be raised at any time. That would be true whether the failure to name the statutory beneficiary as a plaintiff or use plaintiff is attributed to a failure to file or to a clerk's error in docketing a filed pleading. In a situation where no financial provisions were made for known beneficiaries, the former is in the nature of a jurisdictional mistake and the latter is an irregularity of process or procedure. Either

would permit, and, in the circumstances of this case, require, opening the judgment to protect the interests of those beneficiaries.

Here, it appears that the parties did undertake compliance with Rule 15–1001. A copy of the unfiled complaint was sent to the parties and, though not required by the Rule, it was "served" on Donna. But, even if we treated Rule 15–1001 as having been substantially complied with, the result would again be the same. Rather than looking to Rule 2–535(b), we would, instead, conclude that the judgment ... was not a final judgment under *Walker v. Essex* [.]

*Id.* at 455–56, 995 A.2d 744 (citations and emphasis omitted).

As to *Williams I*, we noted that Lori's counsel purposefully avoided contact with the use plaintiffs, and neither Lori nor her counsel notified the sons of the terms of the settlement, "much less actively sought [the sons'] consent to the Settlement Agreement." *Id.* at 462, 995 A.2d 744. This Court ultimately vacated the judgment and settlement approved in *Williams I* and granted the motion to consolidate *Williams I* and *Williams II,* "keeping in mind that all statutory beneficiaries are to be either plaintiffs or use plaintiffs in the consolidated case." *Id.* at 463, 995 A.2d 744.

In *Ace Am. Ins. Co.,* 418 Md. at 403, 427, 15 A.3d 761 the Court of Appeals affirmed this Court's decision in *Williams,* concluding as follows:

We agree with the [Court of Special Appeals]'s interpretation of Md. Rule 15–1001(b), which is entirely consistent with our holding in *Walker v. Essex,* [ ] as well as with the provisions of [C.J.P.] § 3–904. We also share the [Court of Special Appeals]'s concerns about the yet to be resolved issues that have arisen as a result of the procedural violations in *Williams I* [.] ... We shall therefore adopt the above quoted portions of the [Court of Special Appeals]'s opinion and affirm the judgment of that Court.

In *Muti,* 426 Md. at 384–85, 44 A.3d 380 the Court of Appeals held that the trial court abused its discretion in dismissing the plaintiffs' wrongful death claims as a sanction for omitting a

decedent's adopted stepson as a use plaintiff. The decedent, Elliott, died, survived by his widow, Guiseppina, and their children, Tom and David ("the plaintiffs"). *Id.* at 363, 44 A.3d 380. After Elliott's death, the plaintiffs brought a claim for wrongful death, but omitted as a use plaintiff Ricky, the decedent's adopted stepson from a prior marriage, and did not otherwise notify Ricky of the action. *Id.* at 362, 44 A.3d 380. The defendant moved to dismiss the complaint for failure to join a necessary party. *Id.* at 364, 44 A.3d 380. The plaintiffs did not amend the complaint to name Ricky as a use plaintiff. *Id.* at 366, 44 A.3d 380. At a hearing on the motion to dismiss, counsel for the plaintiffs argued that he had been unable to locate Ricky and that he would "amend, by relation back, if they found Ricky alive." *Id.* The trial court granted the motion to dismiss for failure to comply with Maryland Rule 15–1001, *i.e.* for failure to name Ricky as a use plaintiff. *Id.*

In *Muti, id.* at 370–71, 44 A.3d 380 the Court of Appeals discussed the Wrongful Death Act statute of limitations, stating:

> Since at least ... 1925[ ], this Court has construed the time limit in the wrongful death statute to be a substantive provision, that is, a condition precedent to asserting the statutorily created cause of action. A plaintiff who does not assert the cause of action within the statutorily prescribed time, now three years, loses the right to sue a defendant who is not estopped to assert the defense. Even infancy of the plaintiff when a wrongful death claim was asserted and settled by a parent of the plaintiff does not toll the triggering of the timeliness condition.

(Citations and footnote omitted). Pursuant to the time limit in the Wrongful Death Act, the Court of Appeals held that Ricky's claim had expired because, as a beneficiary, he had not brought an action within three years of Elliott's death. *Id.* at 376, 44 A.3d 380. The plaintiffs argued that "the trial court erred by not applying the doctrine of relation back and treating Ricky as having been named as a use plaintiff when [they] filed their action." *Id.* The Court of Appeals held that the doctrine of relation back would not be applied, however,

"because Ricky's claim ha[d] expired by operation of the three year condition precedent." *Id.* at 376–77, 44 A.3d 380. In other words, "relation back does not apply to wrongful death claims barred by the three year condition precedent." *Id.* at 380–81, 44 A.3d 380.

The Court of Appeals discussed Maryland Rule 15–1001, stating that the purpose of the Rule "is to implement the one-action provision in the statute. The purpose of that provision 'is to protect a defendant from being vexed by several suits instituted by or on behalf of different equitable plaintiffs for the same injury when all of the parties could be joined in one proceeding.'" *Id.* at 380, 44 A.3d 380 (citation and emphasis omitted). As to prejudice to Ricky, the Court of Appeals observed that it was "difficult to consider how a claim by Ricky could have any value, even if it were timely asserted." *Id.* As to the plaintiffs' duty, the Court of Appeals stated, in no uncertain terms, that the plaintiffs should have identified Ricky as a use plaintiff, despite their lack of knowledge of his whereabouts. *Id.* at 381, 44 A.3d 380. The Court of Appeals determined that Maryland Rule 15–1001(b) "requires that 'all persons who are or may be entitled by law to damages' be named as plaintiffs. Those beneficiaries who do not join are to be named as use plaintiffs." *Id.* According to the Court of Appeals, the plaintiffs could have named Ricky as a use plaintiff and stated in their complaint that "any address for use plaintiff Ricky was unknown." *Id.* at 382, 44 A.3d 380. In so making that representation in a complaint, however, the Court of Appeals stated that the plaintiffs' counsel first had a duty to conduct a good faith and reasonably diligent search for the use plaintiff. *Id.* The Court of Appeals concluded:

> In cases in which the identity and location of the beneficiaries is known by the original plaintiffs, there ordinarily should be no difficulty in complying with Rule 15–1001. In cases where the whereabouts of an identified beneficiary are unknown, compliance with the steps outlined above, *i.e.,* identification of the use plaintiff, a bona fide and reasonably diligent search, and advising the court if the original plaintiff has been unable to find a last known address for the use

plaintiff, ordinarily should satisfy whatever obligations an original plaintiff has to a use plaintiff that can be derived from [C.J.P.] § 3–904 or Rule 15–1001.

*Id.* The Court of Appeals thus held that the trial court abused its discretion in dismissing the plaintiffs' wrongful death claims as a sanction for omitting Ricky as a use plaintiff. *Id.* at 384–85, 44 A.3d 380. The Court of Appeals remanded the case for consideration of "what, if any, sanction for the omission is appropriate from the standpoint of reinforcing for the Bar as a whole the requirement for naming, as a use plaintiff, a potential beneficiary." *Id.* at 385, 44 A.3d 380.

In a section labeled *"Some Considered Dicta,"* in *Muti, id.* at 384, 44 A.3d 380 the Court of Appeals stated the following:

Even if Ricky had been identified as a use plaintiff when this action was filed, but did not "join" as a plaintiff within three years of Elliott's death, his identification as a use plaintiff would not permit [h]im to join more than three years after Elliott's death. Rule 15–1001(b) distinguishes between those beneficiaries who join in the action for damages and those, the use plaintiffs, who do not. **Use plaintiffs who wish to assert their respective claims for damages must timely join the action by indicating to the court and to the original parties in some clear fashion that they are claiming their "share." Ordinarily, this is done by intervening** .... Intervention in wrongful death cases is now covered by Rule 2–214.

[C.J.P.] § 3–904 and Rule 15–1001 cannot be construed to anoint counsel for the original (*i.e.* joined) plaintiffs as the attorney for the use plaintiffs as well. By designating potential beneficiaries as use plaintiffs, counsel demonstrates that he or she does not represent them and has no authority to make decisions for them or to present evidence, including proof of damages, on their behalf. To hold otherwise invites grave problems of conflict of interest.

(Emphasis added).

After the Court of Appeals's decision in *Muti,* on July 26, 2012, the Standing Committee on Rules of Practice and Proce-

dure issued its 174th Report, including a Notice of Proposed Rules Changes, stating that amendments to Maryland Rule 15–1001 were necessary:

> to conform with holdings in *University of Md. Medical Systems [System ] v. Muti* [426 Md. 358 44 A.3d 380] (2012), including the duty of the named plaintiffs to make a good faith and reasonably diligent effort to identify, locate, and name as "use plaintiffs" all individuals who may qualify as such, to send a certain notice to such individuals, to require certain action by such individuals who wish to make a claim, and to provide for a waiver of the right of use plaintiffs to make a claim.

Maryland Rule 15–1001 was amended, effective January 1, 2013. The Rule now requires that a wrongful death complaint state the last known address for each use plaintiff and the party bringing the action state that he or she conducted a good faith and reasonably diligent effort to identify, locate, and name all individuals who might qualify as use plaintiffs. The new Rule requires that notice to the use plaintiffs be achieved through in personam service of process as set forth in Maryland Rule 2–121, whereas the old Rule simply required that a copy of the complaint be sent certified mail to the use plaintiff at his or her last known address and that proof of mailing be filed with the court. The new Rule adds provisions setting forth requirements that use plaintiffs must comply with to make a claim. Significantly, the new Rule requires that a use plaintiff who wishes to make a claim file a complaint or motion to intervene within certain statutory deadlines or risk exclusion from participation in the action.[3]

---

**3.** Maryland Rule 15–1001 currently provides, in pertinent part:

(b) Required plaintiffs. All persons who are or may be entitled by law to claim damages by reason of the wrongful death shall be named as plaintiffs whether or not they join in the action. The words "to the use of" shall precede the name of any person named as a plaintiff who does not join in the action.

. . .

(e) Waiver by inaction.

. . .

### (3) Analysis

 Returning to the case at hand, we review the decision to grant or deny the motion for judgment notwithstanding the verdict *de novo. Scapa Dryer Fabrics, Inc. v. Saville,* 418 Md. 496, 503, 16 A.3d 159 (2011). In agreement with appellant, we conclude that the use plaintiffs, in the four consolidated matters, are not parties to the cases as they failed to join the actions and are, therefore, unable to recover damages. We reverse and vacate the judgments entered against appellant in favor of the use plaintiffs. We explain.

The record demonstrates in no uncertain terms that the use plaintiffs never joined the action as party plaintiffs, and that appellees and their counsel misapprehended the need to join the use plaintiffs as party plaintiffs. Although amended complaints were filed identifying the use plaintiffs as use plaintiffs, it is undisputed that the use plaintiffs never filed a motion to intervene, no attorney filed a notice of appearance on behalf of the use plaintiffs, and the plaintiffs never filed amended complaints or amendments by interlineation naming the use plaintiffs as party plaintiffs.

The identification of an individual as a use plaintiff does not designate the individual as a party plaintiff with the right to recover damages for the wrongful death of the decedents. C.J.P. § 3–904(f) provides that only one action for wrongful death may lie with respect to the death of a person. In keeping with this requirement, Maryland Rule 15–1001(b) [4]

---

(2) **Failure to satisfy statutory time requirements.** An individual who fails to file a complaint or motion to intervene by the statutory deadline may not participate in the action or claim a recovery. (3) **Other late filing.** If a use plaintiff who is served with a complaint and notice in accordance with section (d) of this Rule does not file a motion to intervene by the served notice deadline, the use plaintiff may not participate in the action or claim any recovery unless, for good cause shown, the court excuses the late filing. The court may not excuse the late filing if the statutory deadline is not met.

(Emphasis added).

4. Unless otherwise noted, all references to Maryland Rule 15–1001 are to the old Rule effective at the time of the proceedings in the circuit court.

required that all individuals "who are or may be entitled by law to damages by reason of the wrongful death shall be named as plaintiffs whether or not they join in the action. **The words 'to the use of' shall precede the name of any person named as a plaintiff who does not join in the action.**" (Emphasis added). Thus, all possible beneficiaries are to be identified in one action for wrongful death, but all beneficiaries need not be party plaintiffs—they can be use plaintiffs who do not join in the action. As to damages, C.J.P. § 3–904(c) provides that, in the one action for wrongful death, "damages may be awarded to the beneficiaries proportioned to the injury resulting from the wrongful death" and "the amount recovered shall be divided among the beneficiaries in shares directed by the verdict." The Court of Appeals has held that the claims of the beneficiaries are not severable, and that a judgment may not be entered by a trial court unless it includes the interests of all known beneficiaries. *Walker,* 318 Md. at 523–24, 569 A.2d 645.

In *Williams,* 192 Md.App. at 452, 995 A.2d 744, we stated that Maryland Rule 15–1001 was "in the nature of a joinder rule or a condition precedent that require[d] all known statutory beneficiaries, *i.e.,* the real parties in interest, be identified as parties to the litigation." We explained, however, that Maryland Rule 15–1001 did not require the statutory beneficiaries to "formally join" the action, and stated: "The words 'to the use of' simply identify plaintiffs who have not formally joined the action, but, as real parties in interest, they are plaintiffs whose interests must be acknowledged and protected throughout the litigation." *Id.* at 455, 995 A.2d 744. The concept that use plaintiffs are real parties in interest comports with the requirement, pursuant to C.J.P. § 3–904(f), that only one action for wrongful death may lie—thus, all beneficiaries, all those with a possible stake in the outcome of the case, must be identified in the case, although they need not formally join and take on the mantle of party plaintiff. As we explained in *Williams, id.* at 460–61, 995 A.2d 744:

> In common law pleading, a "use plaintiff" is "[a] plaintiff for whom action is brought in another's name." As ex-

plained above, Rule 15–1001(b) requires that all the statutory beneficiaries be made plaintiffs in a wrongful death action, whether or not they join. **When they do not join in the action, they are identified as "use plaintiffs" and the action proceeds to their use or benefit.** All known beneficiaries must be "plaintiffs" under the rule and the court is put on notice that any recovery is for the benefit of all plaintiffs, joined or otherwise, in accordance with their statutory interest, whether that interest is represented by an award of damages as the result of a trial, [C.J.P.] § 3–904(c), or by a settlement, *Walker,* 318 Md. at 518 [569 A.2d 645].

(Emphasis added) (footnote and one citation omitted) (alteration in original).

■ As such, it is evident that use plaintiffs are, in fact, different from party plaintiffs in several key respects: (1) use plaintiffs do not join the action, but rather the action proceeds to their use or benefit; (2) use plaintiffs cannot recover damages in their own names as the action is brought to their use or benefit and not in their own name or on their own behalf; and (3) use plaintiffs' recovery is confined to the methods provided for in C.J.P. § 3–904(c) in that the recovery awarded for the party plaintiffs is for the benefit of all plaintiffs—party plaintiffs and use plaintiffs. In short, appellees' contention otherwise—that use plaintiffs are party plaintiffs and need not join the action to recover—is an incorrect assessment of the law. Indeed, appellees' contention that designation as a use plaintiff accomplishes joinder of the use plaintiff is in conflict with the language of the Rule and case law, which clearly state that a use plaintiff is someone who has not joined the action. This point was made explicit in the Court of Appeals's decision in *Muti.* The Court of Appeals unequivocally stated:

Rule 15–1001(b) distinguishes between those beneficiaries who join in the action for damages and those, the use plaintiffs, who do not. **Use plaintiffs who wish to assert their respective claims for damages must timely join the action by indicating to the court and to the original**

parties in some clear fashion that they are claiming their "share." Ordinarily, this is done by intervening.... Intervention in wrongful death cases is now covered by Rule 2–214.

*Muti*, 426 Md. at 384, 44 A.3d 380 (emphasis added).[5]

Significantly, the language in *Muti* is contained in a section labeled "*Some Considered Dicta.*" From our perspective, there is a range of *dicta* and the language at issue rose above the level of mere *dicta* or an errant comment. In *Bryan v. State Rds. Comm'n*, 115 Md.App. 707, 712–13, 694 A.2d 522 (1997), *aff'd*, 356 Md. 4, 736 A.2d 1057 (1999), we discussed statements of *dicta*, stating:

> Unlike holdings, statements of dicta are remarks "by the way" including any statement of the law enunciated by the court merely by way of "illustration, argument, analogy or suggestion." As explained ...:
>
> > The precedential weight of a holding is predicated in large measure on its status as the deliberate and considered judgment of an entire collegiate court, including the opinion writer, on the issue before it that must be decided.... A holding, therefore, has earned the authoritative weight we give it.
> >
> > ....
> >
> > Well considered *dicta*, of course, is sometimes very good and, therefore, of significant persuasive weight. That is a far cry, however, from giving persuasive weight to every hurried word that may appear in the course of an opinion.

---

**5.** At oral argument, appellees contended that *Muti* contains contradictory language, stating that use plaintiffs need not formally join court proceedings and stating, in *dicta*, that use plaintiffs must join the action to claim their share. We see no such contradictory language in *Muti*. Rather, throughout the opinion, the Court of Appeals takes great pains to clarify that, although Maryland Rule 15–1001 does not require formal joinder of use plaintiffs, the Rule requires that all use plaintiffs be identified. At no point does the Court of Appeals state that use plaintiffs are not required to join the action to be considered party plaintiffs.

(Citations and emphasis omitted) (first omission added). It is evident in *Muti* that, by labeling the section *"Some Considered Dicta"* and by including several paragraphs within the section for the purpose of clarifying the case law on use plaintiffs, the *dicta* is more than just a "casual or hurried word[,]" or a "by the way" statement. *Bryan*, 115 Md.App. at 713, 712, 694 A.2d 522 (citation omitted). The language in *Muti* is well considered *dicta* and entitled to "significant persuasive weight." *Id.* at 713, 694 A.2d 522 (citation omitted). The persuasive weight of the language was evident given the Standing Committee on Rules of Practice and Procedure proposed amendments to Maryland Rule 15–1001, incorporating the holdings in *Muti* to require, *inter alia*, "certain action by such individuals who wish to make a claim[.]"

Ending any debate about the matter, the Court of Appeals adopted the amendments, and the newly effective Maryland Rule 15–1001 now contains language incorporating the considered *dicta* from *Muti*—namely, that use plaintiffs are required to file a complaint or motion to intervene by the statutory deadline to participate in the action or claim a recovery. *See* Md. R. 15–1001(e)(2). The new language of Maryland Rule 15–1001 simply clarified the law in Maryland as to use plaintiffs.[6]

---

6. At oral argument, appellees argued that *Muti* effectuated a change in the law and was not retroactive, *i.e.* that *Muti* does not apply to the instant case as it was decided after the events in this case. Appellees acknowledged that the issue of retroactivity was not raised or argued on brief, but urged this Court to find that *Muti* is not retroactive. In response, appellant argued that *Muti* was a clarification of the law concerning use plaintiffs, not a change in the law, and, therefore, retroactivity is not an issue. Although we need not address the matter of retroactivity as it was not briefed before this Court, *see* Md. R. 8–504(a)(6) ("A brief shall comply with the requirements of Rule 8–112 and include … [a]rgument in support of the party's position on each issue."); *Chesek v. Jones*, 406 Md. 446, 455 n. 7, 959 A.2d 795 (2008) ("[Appellate courts have] held consistently 'that a question not presented or argued in a[ party]'s brief is waived or abandoned and is, therefore, not properly preserved for review.' " (Citation omitted)), we agree with appellant that *Muti* merely clarified the law concerning use plaintiffs and did not effectuate or change the law as applied in the case. As stated previously, prior to *Muti,* the case law stood for the

In this case, that the use plaintiffs were, on occasion, identified by the plaintiffs as "plaintiffs" or that the use plaintiffs participated in pretrial depositions and testified at trial, simply put, does not convert them to party plaintiffs. Appellees are correct that the record reflects that, on a few occasions, the plaintiffs referred to the use plaintiffs generally as "plaintiffs." For example, in the proposed *voir dire*, the plaintiffs proposed asking the jury panel the following question: "Is any member of the panel or any member of your immediate family, or close circle of friends related to or otherwise acquainted with the plaintiffs: [lists names of plaintiffs and use plaintiffs]." [7] The occasional reference to the use plaintiffs as "plaintiffs" is not sufficient notice of joinder. Rather, the use plaintiffs were required to timely file an amended complaint, an amendment by interlineation, a motion to intervene, or some other pleading, to identify them as party plaintiffs and not wait until after the close of evidence at trial to make an oral motion to join in the case as was done here.

As the use plaintiffs did not join the action and did not timely move to join the action, they are now barred from doing so as the statute of limitations in each of the cases has expired. C.J.P. § 3–904(g) provides a general three year statute of limitations for wrongful death actions, requiring that actions for deaths caused by occupational disease be filed within three years after the discovery of the cause of death. Under the Second Amended and Restated Asbestos BI Claims

---

proposition that use plaintiffs were required to join the action to claim damages for themselves. Thus, *Muti* did not change the preexisting law, but rather restated that use plaintiffs wishing to claim their share must timely join the action.

7. Appellees contend that the answers to interrogatories identified the use plaintiffs as party plaintiffs. The record belies that contention, however, as the answers to interrogatories merely identify James's, Lawrence's, Carter's, and Hewitt's children and list those individuals dependent upon the four men for financial support. This is a far cry from identifying the individuals as party plaintiffs. And we note that the language used within the answers to interrogatories referred to the singular "plaintiff" throughout (Peoples, Drager, Sonia, and Roger Jr.), and did not mention or refer to others by the designation "plaintiff" or "use plaintiff."

Resolutions Procedures for claims against appellant, the statute of limitations is tolled as follows: claims accruing after November 16, 1985, and prior to August 26, 2009, may be brought against appellant before (1) the expiration of the ninety-day period immediately following September 28, 2010, when the Claims Materials were made public, *i.e.* December 28, 2010, or (2) the expiration of the statute of limitations applicable to the claim, whichever is later.

As to the four cases at issue, the statute of limitations expired on the following dates: (1) **In the *James* case, the statute of limitations expired on December 28, 2010.** The record reflects that James died on July 4, 2004. On January 5, 2007, the amended complaint alleged wrongful death due to lung cancer. Accordingly, under C.J.P. § 3–904(g), the statute of limitations expired, at the latest, on January 5, 2010, three years later. Pursuant to the Claims Resolutions Procedures, however, claims against appellant could be brought against appellant by the expiration of the statute of limitations—here, January 5, 2010—or December 28, 2010, whichever is later. December 28, 2010, is, therefore, the expiration date. (2) **In the *Lawrence* case, the statute of limitations expired on February 21, 2011.** Lawrence died on October 8, 2007. On February 21, 2008, the amended complaint alleged wrongful death due to lung cancer. Accordingly, under C.J.P. § 3–904(g), the statute of limitations expired, at the latest, on February 21, 2011, three years later, and the later date between that and December 28, 2010. (3) **In the *Carter* case, the statute of limitations expired on December 28, 2010.** Carter died on November 6, 2003. Prior to his death, on November 27, 2002, Carter filed a complaint alleging an asbestos-related disease. On February 17, 2006, the amended complaint alleged wrongful death due to lung cancer. Accordingly, the three year statute of limitations under C.J.P. § 3–904(g) expired, at the latest, on February 17, 2009. Pursuant to the Claims Resolutions Procedures, however, claims against appellant could be brought by the expiration of the statute of limitations—here, February 17, 2009—or December 28, 2010, whichever is later. December 28, 2010, is, therefore, the

expiration date. (4) **In the** *Hewitt* **case, the statute of limitations expired July 24, 2012.** Hewitt died on December 20, 2008. Prior to his death, on September 7, 2006, Hewitt filed a complaint alleging asbestosis and an asbestos-related disease. On July 24, 2009, the amended complaint alleged wrongful death due to lung cancer. Accordingly, the three year statute of limitations under C.J.P. § 3–904(g) expired, at the latest, on July 24, 2012, the later date between that and December 28, 2010.

In sum, any claims by the use plaintiffs in their own right as party plaintiffs were required to be asserted by December 28, 2010, as to the *James* and *Carter* cases, February 21, 2011, as to the *Lawrence* case, and July 24, 2012, as to the *Hewitt* case. The use plaintiffs failed to assert claims as party plaintiffs by any of the above listed dates.

■ The use plaintiffs are barred from asserting claims because the doctrine of relation back is not applicable. Although Maryland generally freely permits amendments and relation back to the date of the original filing, "[w]hen amendment is sought to add a *new party* to the proceedings, that principle is inapplicable because *any* cause of action as to that party is, of course, a new cause of action." *Grand–Pierre*, 97 Md.App. at 175–76, 627 A.2d 550 (emphasis in original) (citations omitted). In addition, relation back is not applicable in circumstances where the new cause of action involves a "wholly distinct measure of damages," and "pyramid[s] the amount sought." *Morrell v. Williams*, 279 Md. 497, 507–08, 366 A.2d 1040 (1976).

In this case, amending the complaints would involve adding the fifteen use plaintiffs as new party plaintiffs bringing new causes of action and increasing the overall amount of damages sought. As such, the doctrine of relation back to the original filings of the amended complaints is not applicable. Indeed, the Court of Appeals explicitly stated in *Muti*, 426 Md. at 380–81, 44 A.3d 380 "relation back does not apply to wrongful death claims barred by the three year condition precedent." It is evident, therefore, that the statute of limitations, in the

four cases, has expired. The use plaintiffs are time-barred at this point from asserting wrongful death claims against appellant.[8] Accordingly, we reverse and vacate the judgments entered against appellant in favor of the use plaintiffs.[9]

## II.

### (1) Contentions

Appellant contends that the circuit court erred in the *Hewitt* case by refusing to instruct the jury as to apportionment of damages and by excluding its expert's testimony on the issue of apportionment. Appellant argues that this Court has previously permitted apportionment pursuant to Restatement (Second) of Torts Section 433A "when a reasonable basis exists to apportion damages between two or more causes of injury." Appellant asserts that the principle of apportionment of damages is not a subset of comparative fault, as apportionment is decided "without regard to fault or negligence by the plaintiff."

Relying on *Dafler v. Raymark Indus., Inc.*, 259 N.J.Super. 17, 611 A.2d 136 (N.J.Super.A.D.1992), *aff'd per curiam*, 132 N.J. 96, 622 A.2d 1305 (1993), appellant maintains that New Jersey appellate courts have ruled that damages may "be apportioned between smoking and asbestos exposure in a lung cancer case where the plaintiff's smoking and asbestos histo-

---

**8.** This case, although factually distinct from *Muti* in several ways, similarly involves a use plaintiff whose wrongful death claim expired because, as a beneficiary under the Wrongful Death Act, he had not sued within three years of the decedent's death. *Muti*, 426 Md. at 376, 44 A.3d 380. The Court of Appeals held that the doctrine of relation back was not applicable, however, "because [the use plaintiff]'s claim has expired by operation of the three year condition precedent." *Id.* at 376–77, 44 A.3d 380. Similarly, the claims of the use plaintiffs in the instant case expired by operation of either the three year condition precedent or the Claims Resolutions Procedures, and the relation back doctrine does not salvage the situation.

**9.** Because we determine that the use plaintiffs were required to be joined in the action, and that the time for their joining the action has expired, we need not address the issue as to Sean Lawrence's and Tanesha Lawrence's paternity.

ries were established and epidemiological evidence showed the risk for lung cancer from each agent."

Appellant contends that the circuit court erred by rejecting apportionment where "the epidemiological evidence of relative risks was undisputed." Appellant argues that Dr. Kerby was prepared to offer the opinion that Hewitt's lung cancer was caused 75% by smoking and 25% by asbestos exposure, and the plaintiffs failed to present "a specific scientific, medical, or factual challenge to [t]his opinion[.]" Appellant asserts that, in disregarding apportionment, the circuit court simply assumed that it was not possible.

Appellees respond that Hewitt suffered one indivisible lung cancer injury, and that the circuit court properly rejected what is in essence a comparative fault argument. Appellees contend that "Maryland law does not allow for comparative fault or apportionment of damages for asbestos-related cancers[.]" Appellees argue that appellant's reliance on New Jersey law is not dispositive as New Jersey follows a form of comparative fault, while Maryland does not.

As to Dr. Kerby's testimony, appellees contend as follows: "Because Maryland is not a comparative fault state, the Court need not address the issues raised in [appellant]'s Dr. Kerby section." As to the merits, appellees argue that appellant failed to present a sufficient factual basis to support Dr. Kerby's opinions, and, therefore, the circuit court properly excluded the doctor's testimony on that basis.

In a reply brief, appellant contends that appellees confuse apportionment with comparative fault. Appellant argues that apportionment may be appropriate even where comparative fault is not available. Appellant asserts that "[t]he question is whether a reasonable basis exists to allow for apportionment, not whether it is proven with precision and exactitude."

### (2) Law

Restatement (Second) of Torts, Section 433A, entitled "Apportionment of Harm to Causes," provides as follows:

(1) Damages for harm are to be apportioned among two or more causes where

 (a) there are distinct harms, or

 (b) there is a reasonable basis for determining the contribution of each cause to a single harm.

(2) Damages for any other harm cannot be apportioned among two or more causes.

Comment a to Section 433A provides:

The rules stated in this Section apply whenever two or more causes have combined to bring about harm to the plaintiff, and each has been a substantial factor in producing the harm, as stated in §§ 431 and 433. They apply where each of the causes in question consists of the tortious conduct of a person; and it is immaterial whether all or any of such persons are joined as defendants in the particular action. The rules stated apply also where one or more of the contributing causes is an innocent one, as where the negligence of a defendant combines with the innocent conduct of another person, or with the operation of a force of nature, or with a pre-existing condition which the defendant has not caused, to bring about the harm to the plaintiff. The rules stated apply also where one of the causes in question is the conduct of the plaintiff himself, whether it be negligent or innocent.

In *Mayer v. N. Arundel Hosp. Ass'n Inc.,* 145 Md.App. 235, 249–50, 802 A.2d 483, *cert. denied,* 371 Md. 70, 806 A.2d 680 (2002), we discussed apportionment of damages pursuant to Restatement (Second) of Torts Section 433A, stating:

Generally, damages for harm are to be apportioned among two or more causes where (1) there are distinct harms, or (2) there is a reasonable basis for determining the contribution of each cause to a single harm. Restatement § 433A(1). Damages for any other harm cannot be apportioned among two or more causes and a wrongdoer is liable for the full extent of the harm. *Id.* § 433A(2). Multiple causes may include the combination of acts of (1) two or more parties, (2) an innocent act and a negligent act, or (3)

an aggravation of a preexisting injury. *Id.* § 433A cmts. a and e.

(Footnote omitted). We stated that "[t]he question of whether a harm is capable of apportionment between two or more causes is for the court if it can be decided as a matter of law." *Id.* at 253, 802 A.2d 483.

In *Mayer, id.* at 254–55, 802 A.2d 483, we discussed Section 433A and concluded:

> In a case where liability of the defendant has been assumed or established and addressing only the question of apportionment of damages, the relevant principles may be summarized as follows. Where there are two or more causes of harm, one defendant, and indivisibility is apparent, the court shall decide that apportionment is not appropriate. Restatement § 434(1). In that situation, the factfinder shall compensate the plaintiff for the entire harm. *Id.* § 433A(2). If there are two or more causes of harm, one defendant, and indivisibility is not apparent, the plaintiff has the burden of producing evidence to show that the harm is not divisible or, if it is, some evidence to show that a harm was produced by each cause and the nature of the harm. *Id.* §§ 433A(1) & 433B(1). If the plaintiff's evidence showing indivisibility is not capable of a reasonable conclusion to the contrary, assuming the defendant has not introduced conflicting evidence, the court shall decide that the harm is not divisible. *Id.* § 434(1). In that situation, the factfinder shall compensate the plaintiff for the entire harm. *Id.* § 433A(2). Where the plaintiff's evidence is capable of different conclusions, the plaintiff has the burden of persuasion with respect to indivisibility or, if it is divisible, as to the extent of the harm caused by the negligent act. *Id.* §§ 433A(1) & 433B(1). If the plaintiff's evidence is capable of different conclusions, the factfinder shall determine if the harm is capable of apportionment and, if so, apportion damages. *Id.* § 434(2). If the factfinder determines the harm was not capable of apportionment, the factfinder shall compensate the plaintiff for the entire harm. *Id.* § 433A(2).

(Footnote omitted).[10]

In *Dafler*, 611 A.2d at 138, an asbestos product liability case, the Superior Court of New Jersey, Appellate Division, affirmed the jury's apportionment of responsibility between the plaintiff and the defendant, finding that the plaintiff contributed 70% to his lung cancer by cigarette smoking and that the defendant contributed 30% to the lung cancer by its asbestos products used in shipbuilding. The Superior Court discussed the principle of apportionment generally, noting that apportionment of damages among multiple causes is "a well-recognized tort principle" and embodied in the Restatement (Second) of Torts Section 433A. *Id.* at 141. The Superior Court stated:

> Once it is determined that the defendant's conduct has been a cause of some damage suffered by the plaintiff, a further question may arise as to the portion of the total damage sustained which may properly be assigned to the defendant, as distinguished from other causes. The question is primarily not one of the fact of causation, but of the feasibility and practical convenience of splitting up the total harm into separate parts which may be attributed to each of two or more causes. Where a factual basis can be found for some rough practical apportionment, which limits a defendant's liability to that part of the harm of which that defendant's conduct has been a cause in fact, it is likely that the apportionment will be made. Where no such basis can be found, the courts generally hold the defendant for the

---

10. In *Gress v. ACandS, Inc.*, 150 Md.App. 369, 375, 387, 820 A.2d 616, *rev'd on other grounds sub nom., Brown & Williamson Tobacco Corp. v. Gress*, 378 Md. 667, 838 A.2d 362 (2003), a case involving allegations "for injuries and death allegedly caused by exposure to both asbestos and inhaled cigarette smoke[,]" this Court held that the trial court did not err in joining asbestos and cigarette industry defendants. In so holding, we observed that the cases involved common questions of law and fact and that the trial court announced its ruling on the issue before the opinion in *Mayer* was issued. *Id.* at 387–88, 820 A.2d 616. We stated that, had the trial court had the benefit of *Mayer*, "it would have rejected [the] contention that [the plaintiffs] were not entitled to join in one action their claims against the Asbestos Defendants and the Cigarette Defendants." *Id.* at 388–89, 820 A.2d 616 (footnote omitted).

entire loss, notwithstanding the fact that other causes have contributed to it.

*Id.* at 142 (quoting Prosser and Keeton, *Law of Torts* § 52, at 345 (5th ed.1984)).

The Superior Court held that the "burden of proving that the harm is capable of apportionment is on the party seeking it[.]" *Id.* at 142. The Superior Court observed that, although the issue of apportionment in asbestos and cigarette industry cases presented was one of first impression, New Jersey courts had approved apportionment of damages in other circumstances, including a worker's compensation case and a medical malpractice case. *Id.* at 144. As an aside, the Superior Court observed that apportionment was consistent with the principles of the state's Comparative Negligence Act. *Id.* at 145.

Apportionment of damages has also been applied under federal law, specifically in cases where an employee seeks relief pursuant to the Federal Employers' Liability Act ("FELA") for injuries sustained during the course of employment. For example, in *CSX Transp., Inc. v. Bickerstaff,* 187 Md.App. 187, 249, 978 A.2d 760, *cert. denied,* 411 Md. 600, 984 A.2d 244 (2009), a FELA case, this Court discussed the issue of damages, observing that there was a "long line of FELA case law in which courts permitted the apportionment of damages for non-negligent causes." (Citations omitted). In *Bickerstaff, id.* at 250–51, 978 A.2d 760, we determined that the trial court's failure to instruct the jury on apportionment in a FELA case "may constitute reversible error[.]" This Court stated, however, that to warrant giving an instruction on apportionment of damages, there must be sufficient evidence adduced at trial to support the instruction. *Id.* at 251, 978 A.2d 760. We described sufficient evidence as follows: "[A] defendant need only produce 'some evidence to support its proposed apportionment instruction' and is 'not required to demonstrate an exact percentage' or a 'mathematical proportion' representing the likelihood of the causal relationship." *Id.* (citation omitted).

### (3) Analysis

◼ Returning to the matter at hand, we conclude that the circuit court erred in the *Hewitt* case in refusing to instruct the jury as to apportionment of damages and by excluding Dr. Kerby's testimony on the issue of apportionment. In opposing Dr. Kerby's testimony and an instruction on apportionment, plaintiffs' counsel argued only that apportionment was not possible and that trial courts have not addressed apportionment of damages for smoking in asbestos cases. Rather than considering whether Dr. Kerby's testimony supported the giving of an apportionment instruction, the circuit court expressed doubt about the jury's ability to apportion damages and stated that the "effort to apportion doesn't really work[.]" In our view, both the circuit court and appellees misunderstood the concept of apportionment, and Maryland case law on the subject.

◼ We begin by stating that the issue of apportionment concerns causation, not comparative negligence as appellees urge this Court to determine. Comparative fault or comparative negligence involves determination of the relative percentages of fault between joint tortfeasors—*i.e.* in a negligence action, comparative negligence involves looking at the respective duties and breaches of the joint tortfeasors. Such a system necessarily requires that a jury consider the actions of the joint tortfeasors leading up to the injury to determine whether both were at fault and, if so, how much of the fault each joint tortfeasor should shoulder. Maryland has explicitly rejected adopting comparative fault or comparative negligence in favor of maintaining contributory negligence. *See Franklin v. Morrison,* 350 Md. 144, 167–68, 711 A.2d 177 (1998); *Harrison v. Montgomery Cty. Bd. of Ed.,* 295 Md. 442, 463, 456 A.2d 894 (1983).

◼ Apportionment of damages, on the other hand, involves instances where there are two or more causes and a reasonable basis exists for determining the contribution of each cause to a single harm—*i.e.* in a negligence action, apportionment of damages involves looking at the causes of

the injury, not the duties and breaches of the tortfeasors. Restatement (Second) of Torts, Section 433A(1)(b). Under apportionment, the relative fault of the parties is not considered and the doctrine applies "whenever two or more causes have combined to bring about harm to the plaintiff[.]" Restatement (Second) of Torts, Section 433A, cmt. a. This Court has adopted and applied apportionment of damages in certain cases. *See Bickerstaff,* 187 Md.App. at 249–51, 978 A.2d 760 (a FELA case); *Gress,* 150 Md.App. at 388–89, 388 n. 11, 820 A.2d 616 (an asbestos cases with asbestos industry and cigarette industry defendants); *Mayer,* 145 Md.App. at 249–50, 254–55, 802 A.2d 483 (a medical negligence case). Thus, the doctrines of apportionment of damages and comparative fault/negligence are distinct and involve different considerations.

Under relevant Maryland case law and the Restatement (Second) of Torts, apportionment of damages between several causes of an injury is appropriate in certain circumstances. Pursuant to Restatement (Second) of Torts, Section 433A(1), apportionment of damages between two or more causes is appropriate "where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm." Multiple causes may include the combination of acts of two or more parties, an innocent act and a negligent act, or an aggravation of a preexisting injury. Restatement (Second) of Torts, Section 433A, cmt. a.

Although not binding authority, we find persuasive the Superior Court of New Jersey's opinion in *Dafler,* a case involving a similar factual scenario as that presented in this case. In *Dafler,* 611 A.2d at 138, the Superior Court of New Jersey affirmed the jury's award which apportioned damages as to the plaintiff's lung cancer, finding that 70% of the damage was caused by the plaintiff's cigarette smoking and that 30% of the damage was caused by the defendant's use of asbestos products in shipbuilding. Notably, in *Dafler, id.* at 140–41, both parties presented expert testimony on the issue of apportionment. In *Dafler, id.* at 140, the plaintiff suffered a single harm—lung cancer—caused by a six-year occupation-

al exposure to asbestos and a forty-five year long cigarette smoking habit. In concluding that the issue of apportionment of damages was properly submitted to the jury, the Superior Court of New Jersey emphasized that the result was "rational and fair" and certainly "fairer than requiring defendant to shoulder the entire causative burden where its contribution in fact was not likely even close to 100%." *Id.* at 146. The Superior Court's determination involving apportionment was not grounded in principles of comparative negligence.

In this case, Hewitt suffered a single harm—lung cancer. He experienced an occupational exposure to asbestos through his work as a laborer, mechanic steamfitter and pipe fitter at the Pennsylvania Railroad from 1943 to 1944, and as a laborer and crane operator at Bethlehem Steel from 1946 to the late 1970s. Notably, from 1943 until his death in 2008, Hewitt smoked cigarettes at a rate of a half a pack to a pack per day. According to appellant's proffer, had Dr. Kerby been permitted to testify, he would have rendered the opinion that occupational exposure to asbestos and cigarette smoking were substantial contributing factors to Hewitt's lung cancer, and that the ratio of relative risk for each to the development of lung cancer was three to one, cigarette smoking to asbestos. Dr. Kerby would have testified that Hewitt's cigarette smoking contributed 75% toward his lung cancer and that Hewitt's occupational exposure to asbestos contributed 25% toward his lung cancer. Due to the circuit court's mistaken belief that apportionment of damages was not possible and not permitted, Dr. Kerby's testimony was excluded. That was error.

In sum, we conclude that the circuit court erred in excluding Dr. Kerby's testimony and, without considering the testimony, erred in refusing to instruct on apportionment of damages. We reverse the judgments entered against appellant in favor of the plaintiffs in the *Hewitt* case and remand for a new trial.[11]

---

11. We reverse the following judgments in the *Hewitt* case:

| Survival | $1,386,686.07 (total) |

## III.

### (1) Contentions

Appellant contends that the circuit court erred in instructing the jury that suppliers and installers have a duty to inspect, test, and analyze the products they supply or install as such a duty is imposed on manufacturers, not suppliers and installers. Appellant argues that Maryland law "imposes a duty on supplier/installers to test and inspect only when the supplier/installer is alleged to have 'been negligent in the installation itself.' " (Citation omitted). Appellant asserts that there was no claim of negligent installation in the case, and that the circuit court, by instructing the jury that W & G "had a duty when no evidence was presented to show whether W & G fulfilled or breached that duty[,]" "created a false impression that [appellant] conceded liability." Appellant maintains that it was "greatly prejudiced" by the instruction and reversal is warranted.

Appellees respond that the circuit court's instructions, as a whole, covered the applicable law regarding negligence and strict liability. Appellees contend that the circuit court's instruction on the duty of installers/suppliers to inspect, test and analyze was part of the state-of-the-art instruction and applicable in both negligence and strict liability cases. Appellees argue that appellant, as a supplier/installer, is held to the same standard as manufacturers under Maryland law. Appellees maintain that appellant "performed additional acts which impose a higher standard of care upon it as a supplier-installer[,]" which encompassed "a duty to discover[.]" Ac-

---

| Loss of consortium | $ 350,000 (total) |
|---|---|
| Wrongful death | $ 550,000 (total) |
| Plaintiff Annette Hewitt | $ 350,000 |
| Plaintiff Roger C. Hewitt, Jr. | $ 200,000 |

As explained in Issue I, *supra*, the judgments entered against appellant as to wrongful death in favor of use plaintiffs Idalyn Williams and Penny Hewitt are reversed and vacated, and the use plaintiffs are time barred from bringing the claims.

cording to appellees, the plaintiffs "presented significant evidence establishing why [appellant]'s conduct warranted a heightened duty as an active installer and supplier of products." In sum, appellees contend that the circuit court's instruction as to appellant's duty was appropriate and accurate.

### (2) Law

In *Eagle–Picher Indus., Inc. v. Balbos,* 326 Md. 179, 186, 604 A.2d 445 (1992), a case involving the deaths of two former shipyard workers caused by malignant mesothelioma resulting from inhalation of microscopic asbestos fibers, the Court of Appeals discussed whether a nonmanufacturing supplier has a duty to inspect or test a product. In *Balbos, id.* at 198–99, 604 A.2d 445, the Court of Appeals noted that the Restatement (Second) of Torts applied different standards of knowledge to manufacturers and nonmanufacturing suppliers as to whether their products are dangerous or defective, stating:

In order to hold a retailer or other nonmanufacturing supplier liable on a negligence theory, a plaintiff must prove that the supplier knew or had "reason to know" of the danger of the product. *See Restatement (Second) of Torts* §§ 388(a), 399, 401 & comment *a*, 402[.] ... A manufacturer, on the other hand, may be held liable when it "should recognize" that the product creates an unreasonable risk of physical harm. *See ... Restatement (Second) of Torts* § 395 & comment *e.* In the Restatement, "reason to know" and "should know" are terms of art:

"(1) The words 'reason to know' are used throughout the Restatement of this Subject to denote the fact that the actor has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists.

"(2) The words 'should know' are used throughout the Restatement of this Subject to denote the fact that a person of reasonable prudence and intelligence or of the superior

intelligence of the actor would ascertain the fact in question in the performance of his duty to another, or would govern his conduct upon the assumption that such fact exists." *Id.* § 12; *see also id.* § 401 comment *a*, § 402 comments *d & e.*

(Footnote and some internal citations omitted).

In *Balbos, id.* at 199–200, 604 A.2d 445, the Court of Appeals observed that it had previously held that a supplier-installer, like Porter, is held to a "should have known" standard when the action is based upon principles of strict liability, leaving open the question of whether the standard for a supplier-installer's knowledge would be different if the action were based upon a negligent failure to warn. The Court of Appeals concluded: "We now hold that, as to a supplier-installer, it is not." *Id.* at 200, 604 A.2d 445. In so concluding, the Court of Appeals stated:

The nonmanufacturing supplier, however, may do something more than merely act as a conduit of goods, and those additional acts may impose a higher standard of care upon the supplier. *See Kaplan v. Stein,* 198 Md. 414, 421–22, 84 A.2d 81, 84–85 (1951) (car dealer had duty to inspect used car that it loaned to customer who had returned purchased car for repair)[.] ... In this case, Porter was not merely a conduit of goods. Porter not only supplied asbestos products to the shipyards, its employees also installed those products, and that installation created danger to other workers. In many cases retailer-installers have been held to a duty to inspect or test a product, although the standard of care is not necessarily as high as that imposed on a manufacturer. 2 Frumer & Friedman, [*Products Liability* ], § 6.03[4], at 6–48, 6–54; *see* Harper & James, [*The Law of Torts* ], § 28.29, at 557 (arguing for a rule that would hold sellers to a duty of discovering defects that could be revealed by inspection, as opposed to mechanical testing); *Seller's Duty, [To Test or Inspect as Affecting His Liability for Product–Causal Injury,* 6 A.L.R.3d 12], § 8 [ (1996) ]. It appears that in most of those cases, however, the retailer-installer has been negligent in the installation itself.

*Balbos,* 326 Md. at 203, 604 A.2d 445 (some internal citations omitted).

In *ACandS, Inc. v. Abate,* 121 Md.App. 590, 697, 710 A.2d 944 (1998), this Court held that the trial court did not err in instructing the jury on the duties of nonmanufacturers. In *ACandS, id.* at 700–01, 710 A.2d 944, the trial court instructed the jury with instructions almost identical to the instructions at issue in this case concerning the duties of nonmanufacturing suppliers and installers. We held as follows:

> With these instructions, [the trial court] made clear that the jury was to determine whether, in light of their particular skills, knowledge, or expertise, certain nonmanufacturing defendants had a duty to discover—or should have known of—the dangers of their products by familiarizing themselves with nonobscure literature. It was not necessary for the judge to provide further instruction—it was for the jury to determine whether a particular defendant had the enhanced duty. [The defendant] Hampshire was free to argue in closing that, for whatever reasons it deemed pertinent, it should not be held to a greater standard.

*Id.* at 701–02, 710 A.2d 944 (footnotes omitted).

When reviewing jury instructions, we give the trial court "wide discretion as to the form … and, absent a clear abuse of that discretion, an instruction will not be reversed on appeal." *Blaw–Knox Constr. Equip. Co. v. Morris,* 88 Md. App. 655, 666–67, 596 A.2d 679 (1991). "Moreover, when an objection is raised as to a court's instruction, attention should not be focused on a particular portion lifted out of context, but rather its adequacy is determined by viewing it as a whole." *Id.* at 667, 596 A.2d 679 (citation and internal quotation marks omitted). We will not "condemn a charge because of the way in which it is expressed or because an isolated part of it does not seem to do justice to one side or the other." *Nora Cloney & Co. v. Pistorio,* 251 Md. 511, 515, 248 A.2d 94 (1968). Even in cases where error is found, "[i]t has long been the policy in this State that [an appellate court] will not reverse a lower

court judgment if the error is harmless." *Flores v. Bell,* 398 Md. 27, 33, 919 A.2d 716 (2007). On appeal,

> a party challenging an erroneous jury instruction in a civil case must demonstrate to the court why the error was prejudicial. An erroneous instruction may be prejudicial if it is misleading or distracting for the jury, and permits the jury members to speculate about inapplicable legal principles. An error may also be prejudicial if the error, by itself, could have precluded a finding of liability where one was warranted.... [I]n certain cases, the mere inability of a reviewing court to rule out prejudice, given the facts of the case, may be enough to declare an error reversible. The reviewing court, in considering these issues, should engage in a comprehensive review of the record, and base its determination on the nature of the instruction and its relation to the issues in the case.

*Barksdale v. Wilkowsky,* 419 Md. 649, 669–70, 20 A.3d 765 (2011) (citations omitted). As to prejudice, the complaining party must show not only "that prejudice was *possible* [,]" but also "that it was *probable.*" *Id.* at 662, 20 A.3d 765 (emphasis in original). In situations where prejudice is "not readily apparent," the Court of Appeals instructs that a "reviewing court must focus on the context and magnitude of the error." *Id.* at 665, 20 A.3d 765.

In *CSX Trans., Inc. v. Pitts,* 203 Md.App. 343, 392, 38 A.3d 445 (2012), *aff'd,* 430 Md. 431, 61 A.3d 767 (2013), we held that it was error for the trial court to instruct the jury that the violation of a statute was evidence of negligence where it was undisputed that the defendant was not alleged to have violated a statute. In *Pitts, id.* at 393, 38 A.3d 445 we nonetheless held that the jury instruction was harmless "[a]bsent evidence of any prejudice, confusion, or even a question by the jury as to the instruction[.]"

### (3) Analysis

■ In this case, upon review of the circuit court's instructions as a whole, we are not persuaded that the circuit court abused its discretion or erred in instructing the jury on the

duties owed by manufacturers and nonmanufacturer suppli-
ers/installers and on state of the art. The circuit court
instructed the jury as to all of the applicable law. The circuit
court instructed the jury that the duty of the "non manufac-
turer supplier to warn plaintiffs is different under some
circumstances than the duty of a manufacturer[,]" and that an
installer-supplier may be under a duty to discover the prod-
ucts it installed were dangerous if the installer-supplier's
employees installed the products and the installer created a
danger to other workers.

In *Balbos,* 326 Md. at 203, 604 A.2d 445, the Court of
Appeals stated: "In many cases retailer-installers[, who act as
more than a conduit of goods,] have been held to a duty to
inspect or test a product, although the standard of care is not
necessarily as high as that imposed on a manufacturer. It
appears that in **most** of those cases, however, the retailer-
installer has been negligent in the installation itself." (Cita-
tions omitted) (emphasis added). Thus, a retailer-installer
who acts as more than a conduit of goods has a duty to inspect
or test a product, even in circumstances where the installation
of the product was not negligent. Here, the evidence adduced
at trial demonstrated that W & G was an installer of asbestos-
containing products—it performed contracting and sales activ-
ities throughout Maryland, and its employees went on site at
other companies to perform installation jobs. W & G was not
simple a middleman in the process, it was an active installer.
A defendant's installation activity, in addition to sales of
products manufactured by others, is a proper basis on which
to hold the defendant to a higher "should have known" stan-
dard generally applicable to a manufacturer as the "standard
considers what reasonably should have been discovered in
light of the supplier's peculiar opportunity and competence as
a dealer in the particular type of chattel." *Id.* at 203–04, 604
A.2d 445. Upon reviewing the instructions as a whole, we
perceive no merit in appellant's contention that the limited
language complained of—"[t]he manufacturer supplier or in-
staller is under a duty to use ordinary care to test, analyze,
and inspect the products it ... sells, supplies, or installs"—

gave rise to the implication that the jury was required to find that appellant breached a duty to inspect, test, or analyze, or that appellant's duty as an installer-supplier was somehow improperly equated with that of a manufacturer.

Alternatively, we observe that to establish that an erroneous instruction warrants reversal, appellant bears the burden of demonstrating prejudice. *Barksdale,* 419 Md. at 669, 20 A.3d 765. Here, despite contentions to the contrary, appellant has failed to demonstrate prejudice. The circuit court correctly instructed the jury as to the duties owed by nonmanufacturer installer-suppliers, and how, under certain circumstances, the nonmanufacturer installer-supplier can be held to a higher standard of care if the installer-supplier undertakes certain actions. In the midst of the instructions, the circuit court gave the brief instruction at issue. The instruction was not repeated or elaborated upon, and the circuit court continued instructing the jury. Appellant does not contend that the instruction was an incorrect statement of law as to the duty owed by a manufacturer. Rather, appellant contends that the instruction improperly equated W & G's duty as an installer-supplier with that of a manufacturer. We note, however, that, at trial, appellant had ample opportunity to present—and did present—evidence demonstrating that W & G was an installer-supplier that did not manufacture or design the asbestos-containing products it installed and repaired.

From the voluminous record in the case, one of the only references we find concerning the instruction is an indirect reference by plaintiffs' counsel in closing argument, stating that when W & G's files were combed through after it ceased operations in 1984, "[t]here was no testing information [found]" and the "files were incomplete." The record reveals, however, that the parties previously had entered into a stipulation, which was read into the record, and included the following:

[W & G] ceased operations in 1984. A review of the [W & G] files after operations ceased was conducted.

1, no medical or scientific literature on the hazards of asbestos was found.

\* \* \*

Number 4, no documents reflecting testing of insulation materials were located.

Number 5, no documents reflected studies of insulation products and the levels of asbestos given off by working with the products were located.

Plaintiffs' counsel's reference in closing argument to the lack of records regarding testing information was simply a restatement of the stipulation between the parties. Under this circumstance, we find it difficult to discern how the reference in closing argument to the lack of testing documentation was prejudicial. Appellant fails, on brief, to provide a reference to any other argument made by plaintiffs' counsel "citing the lack of testing," and we decline to comb through the record to substantiate appellant's claim. There were no questions from the jury as to the erroneous instruction [12] or any indication that the jury focused on the erroneous instruction. Other than the instruction being given, amidst numerous other instructions, the record is devoid of any basis to support appellant's contention of prejudice. "Absent evidence of any prejudice, confusion, or even a question by the jury as to the instruction," *Pitts*, 203 Md.App. at 393, 38 A.3d 445 we conclude that any alleged error with the jury instruction as to the duty to test, inspect, and analyze was harmless, and does not warrant reversal.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED, IN PART, AND REVERSED, IN PART, AS STATED IN THE OPINION. CASE REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY 1/3 BY APPELLANT AND 2/3 BY APPELLEES.**

-------

12. The record reflects that the jury asked one question concerning the *James* case, namely, "why is Kevin in jail and how long will he remain incarcerated[?]"